## In the Matter of David G. Stern.

Suffolk. April 8, 1997. - August 14, 1997.

Present: Wilkins, C.J., Abrams, Lynch, & O'Connor, JJ.

*Attorney at Law,* Disciplinary proceeding, Attorney-client relationship, Disbarment. *Evidence,* Credibility of witness.

In a disciplinary proceeding, the conclusion of the Board of Bar Overseers that an attorney was acting as an attorney with respect to the mishandling of certain trust assets of his clients, and was thus subject to discipline by the board, was supported by the evidence. [711-713]

Disciplinary proceedings against an attorney were commenced in a timely manner and no prejudice was demonstrated from any delay. [713]

In a disciplinary proceeding, the Board of Bar Overseers properly resolved issues of credibility of the witnesses [713-714], and the board's findings were supported by the evidence [714-715].

Evidence at an attorney disciplinary proceeding supported the findings of the Board of Bar Overseers that the attorney used clients' trust funds to pay interest on his personal loans, that the attorney had, without the clients' knowledge or consent, invested the clients' trust funds, and that the clients never received anything of value in return. [715-716]

Disbarment was the appropriate sanction for an attorney's intentional misuse of client funds, and the sanction was not "markedly disparate" from those in similar cases. [716-717]

Information filed in the Supreme Judicial Court for the county of Suffolk on December 18, 1996.

The case was reported by *Greaney,* J.

*J. Owen Todd* (*Juliet Davidson* with him) for David G. Stern.

*Terence McBride Troyer,* Assistant Bar Counsel.

Abrams, J. Based on an information and a record of proceedings filed in the county court, a single justice of this court has reserved and reported this disciplinary proceeding. A hearing committee (committee) determined that the respondent, David G. Stern, as a trustee, improperly transferred more than $3.5 million from a revocable trust belonging to Bertram and Dianne Parker. The committee issued its decision and recommended that the respondent be disbarred. The Board of Bar Overseers

(board) adopted the committee's findings of fact, and agreed with the committee that the appropriate sanction was disbarment.[1] The board voted to file an information in the county court recommending disbarment.

On appeal, the respondent asserts that he should not be subject to discipline because the transactions at issue did not involve an attorney-client relationship with the Parkers, see *Fanaras Enters., Inc.* v. *Doane*, 423 Mass. 121 (1996), and that the disciplinary proceedings should be dismissed due to "unconscionable delay." In addition, the respondent claims error in the board's evidentiary rulings. Finally, the respondent argues that the board's recommendation of disbarment is "markedly disparate" from sanctions imposed in similar cases. For the reasons stated in this opinion, we conclude that there were no legal or procedural errors, no reversible evidentiary rulings, and that disbarment is the appropriate sanction.

We summarize the facts in this disciplinary action as they were submitted to us in this proceeding. *Matter of Hurley*, 418 Mass. 649, 650 (1994), cert. denied, 514 U.S. 1036 (1995). The respondent was admitted to the Massachusetts bar in 1971. He has been employed as an associate and partner at three respected Boston firms. Since August of 1989, he has been a sole practitioner.

Shortly before his admission to the bar, the respondent met Bertram and Dianne Parker. He became very friendly with them and occupied a position of trust and confidence with them. Their legal business followed the respondent to the various firms at which he was employed. The board found "that an attorney client relationship existed between the [r]espondent and Bertram and Dianne Parker at all relevant times from the date of [r]espondent's admission to the bar until August, 1989."

In 1972, attorneys at the firm where the respondent was then employed created a revocable trust in which the Parkers could hold their substantial assets.[2] The Parkers were named as the original trustees. In 1978, on the advice of the respondent, the trust was amended to name the respondent as a cotrustee, "to enable [him] to carry out the Parkers' wishes because of his familiarity with their affairs."

Between April 14, 1986, and July 28, 1989, approximately $7

---

[1]Because the board adopted the committee's findings of fact, we refer to the findings as the board's.

[2]At one point, the value of the trust assets exceeded $10 million.

million was transferred at the respondent's direction from the Parkers' trust for the benefit of two movie production businesses in which the respondent had an interest. A number of the transfers, though not all, were made without the Parkers' authorization, and some were made using documents that contained the forged signature of Bertram Parker. The board concluded that "[neither] the Parker trust [n]or the Parkers individually ever received anything of value in return for these transfers."

The board also made specific findings that (1) in every instance where Bertram Parker testified that a signature on a document was not his signature or authorized by him, the signature was in fact forged; (2) there was no credible evidence that the respondent ever held a general written power of attorney (as he had claimed) that would have permitted him to sign the Parkers' names, dispose of their assets, transfer their assets, or otherwise commit them to any legal liability; (3) the respondent, without the Parkers' authorization, used funds from the Parker trust to pay interest on a personal loan of his; (4) the respondent had sufficient control of the forged documents and knowledge of Bertram Parker's signature to have known that the signatures on the documents were not Parker's; (5) that the Parkers essentially were ignorant of the affairs of the respondent's movie production business, the respondent having failed to keep them advised of the extent of their involvement and exposure; and (6) the respondent was the sole person who communicated in behalf of the trust with the bank that managed the trust's funds.

The board determined that (1) the respondent "entered into a business relationship and business transactions with a client and failed to advise the client to obtain independent legal advice and counsel"; (2) the respondent "breached his fiduciary duties as trustee of the Parker trust and his interests constituted a conflict of interest"; (3) the respondent's "actions in borrowing money in the name of the trust without the knowledge or consent of the Parkers and his use of trust assets to pay interest on the loans were fraudulent, deceitful, dishonest and constituted misrepresentation . . . and further were actions prejudicial to and damaging to a client"; and (4) the "failure to insure that the client received independent advice and counsel and his failure to fully inform the client of the true state of his affairs, thereby leaving the client in ignorance and misunderstanding of

his affairs while the [r]espondent continued to manage those affairs for his own benefit were fraudulent, deceitful, dishonest and constituted misrepresentation."[3]

The board also concluded that the respondent's testimony in explanation of these transactions "was not credible" based on (1) the inconsistency in his testimony as to whether he had discussed these transactions with the New York attorney who represented the Parkers; (2) misrepresentations that the respondent had made to his prospective partners in one of his law firms concerning the Parkers; (3) his "wholly unconvincing testimony" of his claim that he was operating under a power of attorney executed by the Parkers, coupled with the fact that he could not produce the document when asked to do so; (4) his denial of the existence of an attorney-client relationship with the Parkers; (5) the "disingenuous manner" in which he claimed that the Parkers were informed of the transactions;[4] and (6) his denial of the existence of, or inability to produce, other documentation of his various allegations. The report stated that "[t]he long and short of a very long-running matter is that upon consideration of the entire record, and the matters particularized above especially, the [board] simply does not believe the [r]espondent."[5]

I. *Dismissal of disciplinary proceedings.* A. *Attorney-client relationship.* Relying on *Fanaras, supra,* the respondent asserts that he cannot be disciplined because he was not acting as an attorney with respect to the transactions at issue. The respondent's reliance is misplaced. The board determined that, while serving as the Parkers' attorney, the respondent recommended that he be added as a trustee to the Parker family trust in 1978 to "enable [him] to carry out the Parkers' wishes." His role as trustee and financial advisor was inextricably linked to his role as their attorney and thus any action taken by the respondent

---

[3]The board concluded that the actions of the respondent violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4)-(6), as appearing in 382 Mass. 769 (1981); S.J.C. Rule 3:07, Canon 5, DR 5-101 (A), as appearing in 382 Mass. 779 (1981); S.J.C. Rule 3:07, Canon 5, DR 5-104 (A), as appearing in 382 Mass. 779 (1981); and S.J.C Rule 3:07, Canon 7, DR 7-101 (A) (3), as appearing in 382 Mass. 784 (1981).

[4]The board found the statements to be "confusing and difficult to analyze, even though in possession of all the ex post facto information elicited at the hearing."

[5]Other facts are included where relevant.

with respect to the trust should have included considerations with respect to his role as their attorney.[6]

The compensation received by the respondent in exchange for his efforts and expertise as a trustee created a fiduciary relationship, which he compromised when he made withdrawals from the trust, without the consent of the Parkers, for the benefit of a movie production company in which he had an interest. The board determined that the respondent's actions were pursuant to an attorney-client relationship and thus violated S.J.C. Rule 3:07, Canon 5, DR 5-101(A) and DR 5-104(A), as appearing in 382 Mass. 779 (1981), and S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (3), as appearing in 382 Mass. 784 (1981).[7] See *Matter of Clooney*, 403 Mass. 654, 657 (1988); *Matter of Romano*, 9 Mass. Att'y Discipline Rep. 274 (1993).

Further, *Fanaras* is distinguishable. In that case, a loan by the plaintiff to the defendant attorney was made without any collateral to secure the loan. The attorney had previously received a retainer from the plaintiff. The plaintiff's contention was that the attorney, by virtue of the retainer agreement, should have advised it to seek the advice of another attorney or to have sought security for the loan. We concluded that a retainer paid to an attorney for a right to prompt legal advice on request did not establish, absent other factors, an attorney-client relationship with respect to an unrelated loan made by the plaintiff to that attorney. *Id.* at 125. In *Fanaras*, we concluded that the attorney was not acting as an attorney, but rather participating in an arm's-length transaction unrelated to the fact that the defendant was an attorney and unrelated to any work being performed by the attorney on behalf of the client.

Here, the board specifically determined that the respondent's role as trustee was that of a legal advisor. The respondent was paid fees both to act as a professional trustee and to act as the Parkers' attorney. The board also noted that "[t]he Parkers

[6]In a memorandum dated March 20, 1989, from the respondent to a partner in Casner, Edwards & Roseman, the respondent himself admitted that Bertram was a client of his and that he received additional fees for acting as a trustee of the Parker family trust.

[7]An attorney-client relationship generally is a matter for the trier of fact to determine and " 'can be implied from the conduct of the parties' and need not be expressed." *Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 522, cert. denied, 493 U.S. 894 (1989), quoting *Page v. Frazier*, 388 Mass. 55, 61 (1983); D.J. Meiselman, Attorney Malpractice: Law and Procedure §§ 1:1-1:5 (1980).

devoted their time and attention to the non-financial aspects of their lives and left the details of business, investment and practical affairs to the [r]espondent." The board's conclusion that an attorney-client relationship existed and that the respondent is subject to discipline under DR 5-101 (A), DR 5-104 (A), and DR 7-101 (A) (3) is supported by the evidence.[8]

B. *Delay.* The respondent also asserts that the disciplinary proceedings should have been dismissed because of "unconscionable delay." We do not agree. Bar counsel opened the respondent's file on June 29, 1990, less than one year after the last act alleged in the petition for discipline. On the date that the file was opened, notice was sent to and received by the respondent in accordance with S.J.C. Rule 4:01, § 7 (2), as amended, 394 Mass. 1106 (1985), and Rule 2.6 of the Rules of the Board of Bar Overseers (West 1997). On August 31, 1994, a copy of the petition for discipline and of the Bar Counsel's disposition memorandum were served on the respondent. In sum, the petition for discipline was commenced within six years after the last act of alleged wrongdoing.

There is no evidence to suggest that bar counsel was lethargic in his pursuit of this matter. As the board recognized, "[t]hese were not simple charges to investigate, especially taking into account the respondent's failure to maintain contemporaneous records of his putative instructions on the handling of the trust's assets." Absent prejudice for the delay, there is no basis for dismissing the claim. See *Matter of Kerlinsky*, 406 Mass. 67, 75 (1989), cert. denied, 498 U.S. 1027 (1991).

II. *Evidentiary rulings.* Relying on *Kerlinsky, supra,* the respondent argues that all issues of credibility should be resolved in his favor due to delay. We do not agree. In *Kerlinsky,* there was a specific finding of prejudice and corroborating

---

[8]Additional facts support the conclusion that the respondent violated the disciplinary rules mentioned: in April, 1986, the respondent asked the Parkers to invest in his movie production companies. The Parkers declined. Despite that response, the respondent, as a trustee, authorized transfers from the Parkers' trust to a movie company in which he had an interest.

On more than one occasion, the respondent encouraged the Parkers to consent to providing collateral for loans made to the movie company in which he had an interest. Regarding a $1 million loan made from the Parker trust in August of 1988, the board made explicit findings that the respondent did not give the Parkers "advice, counsel or explanation regarding the import, meaning and effect of the documents . . . [or] cause or arrange for such advice, counsel or explanation to be given by independent counsel."

evidence to support Kerlinsky's claim that favorable evidence was lost due to laches. As a result, the board chose to resolve certain credibility issues in his favor. *Id.* at 75-76. By contrast here, there was no corroborating evidence lost as a result of delay by bar counsel or the board. Generally, we adhere to the principle that the board is "the sole judge of the credibility of the testimony presented at the hearing." S.J.C. Rule 4:01, § 8 (3), as amended, 415 Mass. 1304 (1993); *Matter of Saab*, 406 Mass. 315, 328 (1989).[9] There is no reason to depart from that rule here.

A. *Sufficiency of proof.* The respondent also asserts that the board impermissibly relied on the disbelief of his testimony as affirmative proof of the charges and that the board never found Bertram Parker to be credible.[10] We do not agree.

The board recognized that "[t]he primary and indeed almost exclusive task of the [board] was to ascertain the credibility of the witnesses, and in particular of the [r]espondent." The fact that the findings correspond to the events as testified to by Bertram Parker indicates that the board found him credible. In its findings, the board repeatedly found facts which were supported by Bertram Parker's testimony. For example, in his testimony, Bertram Parker stated that he did not sign numerous documents that bore his signature. One of the board's findings specifically stated that "[a]ll of the documents bearing the purported signature of Bertram B. Parker, where Mr. Parker has disavowed the signature, were not signed by him, or by his authorization and such signatures are forgeries."

The physical evidence referenced by the board also corresponds with Bertram Parker's testimony. Despite the Parkers' decision not to invest in the movie company in 1986, there is evidence of a transfer of $125,000 of trust assets between April and September, 1986. In February, 1988, the respondent transferred over $1 million from the trust to cover gaps in financing that had arisen in his movie production company. The board was free to accept Bertram Parker's testimony that he

[9]The board made explicit findings that the testimony of the respondent was not credible. These findings were based on specific inconsistencies in the respondent's testimony and on incidents in the past that called into question the respondent's credibility. See *supra* at 710-711.

[10]The respondent correctly acknowledges that the board's disbelief of the respondent's testimony is not open to challenge. See *Matter of Saab*, 406 Mass. 315, 328 (1989).

was unaware of the transactions. This testimony refuted the respondent's claim that the Parkers knew of and approved of the transactions. Thus, the board's findings are supported by evidence, and not just disbelief of the respondent.

B. *Trust activities.* The respondent challenges the rulings that the Parkers were ignorant as to the activities of the trust, that the respondent used trust funds to pay interest on personal loans, and that the Parkers did not have a substantial equity interest in the movie production company.

In challenging the determination that the Parkers did not understand the activities of their trust, the respondent points to the quarterly statements which he alleges the Parkers received, despite the fact that these reports were sent to their address but with an incorrect zip code, were lengthy, and, in some instances, were missing sections. For a period of time, these reports came to the Parkers through the respondent, and were missing the section that delineated the trust transactions.

The board determined that it was the respondent who received the reports and that he did nothing to ensure that the Parkers understood the trust activities. As the board observed, "without [detailed, meaningful, and informative] analysis, the Parkers alone would be most unlikely to understand the statements or learn from them the true extent of their involvement with [the movie production company]."

With respect to the claim that the respondent used funds from the Bertram Parker account to pay interest on personal loans, there was evidence that, on July 17, 1989, the respondent made a withdrawal by debit memorandum from a demand account in the name of Bertram Parker, care of David Stern, in the amount of $22,359.70. According to an official at Shawmut Bank, the bank issued three consecutively numbered credit memoranda on July 17, 1989, totaling $22,359.70. One of the memoranda showed an interest payment of $1,679.17 on the respondent's personal loan. From that evidence, the board could conclude that the respondent used Bertram Parker's money for an interest payment on his personal loan.[11]

The respondent's further allegation that the board's finding that the Parkers did not have a substantial equity interest in the movie production company is countered by Bertram Parker's

---

[11]The other two credit memoranda paid interest on loans held by the Parkers and by the movie production company.

testimony that his only knowledge of ownership in the movie production company was a purchase of shares for $2,450.[12] Whether to believe Bertram Parker's testimony was for the board. See *Saab, supra.*

Physical evidence supported Bertram Parker's testimony. The documentation regarding the extent of the Parkers' ownership was a "stock summary" in evidence which showed that the Parkers owned the 2,450 shares that he testified to owning, which amounted to a 14.7% interest in the movie production company.[13]

The documents referenced by the respondent do not indicate knowledge of a large ownership stake in the movie production company. The only document that addressed stock ownership with Bertram Parker's signature authorized the transfer of shares in his name to the joint name of Bertram and Dianne Parker. In this document, there is no indication of the number of shares owned by the Parkers. In short, from the evidence, the board could conclude that the Parkers did not have any substantial equity interest in the movie production company in which the respondent had an interest.

III. *Sanction.* Finally, we do not agree with the respondent's argument that the board's recommended sanction of disbarment is disparate with other cases. The board highlighted the following violations in proposing disbarment as the appropriate sanction: entering into a business relationship and business transactions with a client without advising the client to obtain independent legal advice and counsel in violation of DR 5-104 (A); breaching his fiduciary duty as a trustee of the Parker trust while his interests constituted a conflict of interest in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5) and DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981), and S.J.C. Rule 3:07, Canon 5, DR 5-101 (A), as appearing in 382 Mass. 779 (1981); borrowing money in the name of the trust without the knowledge or consent of the Parkers and using trust assets to pay interest on his personal loans in violation of DR 1-102 (A) (4), DR 1-102 (A) (6), and DR 7-101 (A) (3); failing to ensure that the client received independent advice and counsel, leaving

---

[12]Bertram Parker also stated that he never acted knowledgeably as an officer of the company as alleged by the respondent.

[13]We note that the board determined that the $2,450 that the Parkers had invested in equity in the movie production company does not constitute a significant investment in light of the vast size of their trust.

the client in ignorance and misunderstanding of his affairs while the respondent continued to manage those affairs for his own benefit in violation of DR 1-102 (A) (4) and DR 1-102 (A) (6).

Disbarment in these circumstances is not "markedly disparate" from those orders ordinarily entered in similar cases. See, e.g., *Clooney, supra* at 658; *Matter of Bryan*, 411 Mass. 288, 291-292 (1991); *Matter of the Discipline of an Attorney*, 392 Mass. 827, 836 (1984) ("Intentional use [of client funds] with intent to deprive or with actual deprivation, should be disciplined by disbarment or indefinite suspension"). The matter is remanded to the county court where a judgment of disbarment shall enter.

*So ordered.*