**SEARS, ROEBUCK & CO.,**
Plaintiff, Appellee,

v.

**GOLDSTONE & SUDALTER, P.C.,**
Defendant, Appellant.

No. 97–1216.

United States Court of Appeals,
First Circuit.

Heard Sept. 3, 1997.
Decided Oct. 22, 1997.

David G. Hanrahan, with whom Ross D. Ginsberg, Gilman, McLaughlin & Hanrahan, LLP, Boston, MA, were on brief, for defendant, appellant.

Allan E. Taylor, with whom Elizabeth C. Sackett, Taylor, Duane, Barton & Gilman, LLP, Boston, MA, were on brief, for plaintiff, appellee.

Before STAHL, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

This case raises issues of Massachusetts law concerning the obligations that attorneys owe clients in their billing practices.

Attorney Daniel Goldstone formed Goldstone & Sudalter, P.C. to purchase the practice of the late Eldon Sudalter, a collection attorney. Goldstone & Sudalter then billed Sears, Roebuck & Co. in excess of one million dollars for past work Goldstone said Attorney Sudalter had performed on Sears's cases. Sears at first paid most of the bills, but eventually sued Goldstone & Sudalter for an accounting, asking for a judicial determination of its total liability, if any, for the past work. Goldstone & Sudalter, in turn, counterclaimed for the unpaid balance.

Following Goldstone's admission that he had no personal knowledge concerning Sudalter's billing practices to support his inter-

pretation of the records which formed the basis for his bills, Sears amended its complaint to include common-law claims for breach of contract and breach of fiduciary duty, and a statutory claim of "unfair and deceptive trade practices" under Mass. Gen. Laws ch. 93A. Sears sought reimbursement for bills it had previously paid and an award of attorney's fees. The district court granted Sears's motion for summary judgment, and awarded it $833,409—the entire amount of Sears's payments on the disputed bills—and $112,000 in attorney's fees.

Although our analysis varies from that of the district court, the summary judgment record reveals that Goldstone & Sudalter has not met its burden of substantiating its bills under Massachusetts law and that Sears has met its burden of showing unfair and deceptive practices. We affirm.

## I. The Facts

We state the facts in the light most favorable to Goldstone & Sudalter, the party opposing summary judgment. *Swain v. Spinney*, 117 F.3d 1, 2 (1st Cir.1997).

In 1991, Daniel Goldstone, then a lawyer with three years of experience, began negotiations with Mrs. Janice Sudalter to purchase the law practice of her late husband Eldon Sudalter. Eldon Sudalter was a solo practitioner and had been the primary collection attorney for Sears in eastern Massachusetts for the previous fifteen years. Mrs. Sudalter had worked in her husband's office for most of that time and her regular duties included preparing the monthly billings for Sears and other clients.

In mid–1991, Goldstone and Mrs. Sudalter signed a letter of intent, and Goldstone formed Goldstone & Sudalter to purchase the assets of the practice and continue the business. In late 1991, the relationship broke down amid mutual recriminations, and Goldstone sued Mrs. Sudalter in state court over the terms of their agreement.

By early 1992, Goldstone was in possession of the files of the Eldon Sudalter practice and was servicing its clients, although Goldstone and Mrs. Sudalter did not finally settle the state court litigation until January 1993.

The settlement provided for a total purchase price of $150,000 for all of the assets, tangible and intangible, of the Eldon Sudalter practice. Goldstone had not actually worked with Attorney Sudalter, and had not discussed with him the firm's billing practices. Goldstone had no personal knowledge of whether particular cases in Sudalter's files had been billed or were uncollectible, or had been formally closed, whether or not billed or uncollectible.

Like many collection attorneys, the late Eldon Sudalter operated on a contingency fee basis. Before 1987, Sears paid Attorney Sudalter one-third of his recovery and reimbursed him for all court costs. That changed. On September 8, 1987, Attorney Sudalter executed a form "Attorney Retention Agreement" prepared by Sears for its collection attorneys throughout the United States.

The 1987 Agreement increased Attorney Sudalter's fee to forty-five percent, but he was now to be responsible for all costs that were not reimbursed by debtors. According to Mrs. Sudalter, under the new agreement, "[W]e take 45 percent of what we collect. If we can recover the costs [from debtors], great. If we can't recover the costs, that's just part of the agreement; that's why they're [Sears] paying us the 45 percent." Goldstone offered no evidence to contradict Mrs. Sudalter's testimony that the forty-five percent contingency fee was intended to take into account all court costs.

According to the 1987 Agreement, the collection attorney was to send all monies collected to Sears on a monthly basis, accompanied by a report; Sears would then pay the attorney's contingency fee. The 1987 Agreement provided: "Attorney will be accountable for all monies collected on any of the accounts and will submit at least monthly a report to Sears listing the accounts on which collections were made and amount collected, together with a check payable to Sears for *all* monies collected." (emphasis supplied). The 1987 Agreement also states, "Attorney waives any attorney's lien on Sears accounts and agrees not to assert such lien against Sears."

Sears did not send individual checks to the Sudalter firm for the particular matters for which they paid Attorney Sudalter his legal fees or costs over the years. Likewise, Attorney Sudalter did not customarily record his receipt of the contingency fee or costs from Sears on each debtor's file. Rather, Attorney Sudalter regularly deposited money from debtors in a Sears client trust account and remitted a single check each month to Sears from the account for the total amount of that month's collections. Sears then remitted the contingency fee for that amount and for any amounts that debtors sent directly to Sears. Before 1987, Sears would reimburse court costs in a single monthly check if Sudalter could not collect them from debtors. After 1987, Sears was not responsible for those costs, although it would still occasionally send Sudalter costs that debtors had sent to Sears instead of Sudalter, again in a single check for that month.

The agreement set forth a separate compensation arrangement if Sears terminated the agreement or withdrew customer accounts. In that event, Sears would pay Sudalter $60 per hour for his time and reimburse his court costs, although it would pay no such fees if Sudalter terminated the agreement or was in breach of the agreement. According to an employee for a collection agency that Sears uses, withdrawing accounts is seen as a "drastic" step because of these fees and costs and for that reason is rarely employed in the collection industry.

In early 1992, Goldstone called Karen D'Angelo, a special accounts manager at Sears, to ask why Sears had stopped sending cases to the Sudalter firm, now operating as Goldstone & Sudalter. D'Angelo was a low-level Sears employee who had been in her present job in Massachusetts for two years and had first spoken to Attorney Sudalter only shortly before he died in 1991. D'Angelo informed Goldstone that Sears rated its collection attorneys by comparing the amounts the attorneys collected monthly as a percentage of their total portfolios. According to Goldstone, D'Angelo informed him that the law practice had "never closed a file in fifteen years," and urged the firm to close these accounts to make its percentage appear more competitive.

Goldstone began "closing" the old files, informing Sears that he would attempt no more collections on such cases. At the same time, he implemented the billing practices at issue in this lawsuit. Goldstone began by reviewing thousands of old files contained in "dead storage" in the basement of the late Eldon Sudalter's former office, many of which had red stickers on them. Some file folders contained handwritten notations of court costs paid by Sudalter and some indicated whether those costs had been reimbursed by debtors or Sears. Goldstone prepared a letter for signature by a Sears representative, "acknowledg[ing] the assignment to Goldstone & Sudalter, P.C. of the contract executed by Eldon B. Sudalter, P.C." in 1987. The letter also referred to that contract, stating, "Specifically, with regard to the 'pre-1992 closed cases,' Sears will be responsible for costs expended and attorneys' fees at the rate of $60.00 per hour in accordance with Exhibit 'B' annexed to the 1987 contract." Emma Scott, an in-house attorney for Sears, signed the letter.

Goldstone states that he regarded this letter as "completely consistent with the earlier Attorney Retention Agreement" and that he did not believe that Scott's signing of the letter was intended to alter the terms of the 1987 Agreement in any way. According to Goldstone's interpretation of the agreement, his "closing" of cases, which he did after his conversation with D'Angelo, triggered Sears's obligation to pay for court costs and work performed on an hourly basis under the contract's provisions regarding cases "withdrawn" by Sears. There is some evidence that Sears's in-house attorneys, at least initially, agreed with Goldstone's interpretation.

From February 1, 1992 until February 23, 1996, Goldstone billed Sears for costs and attorney's fees on each of over 15,000 files. He derived his cost figures from the handwritten notations on the outside of the folders. He assumed that Sudalter had not been reimbursed by Sears or debtors unless there was a handwritten note to that effect on the folder. He derived his figures for attorney's fees by estimating the amount of time that

Sudalter had spent on each file by examining the tasks that the file reflected had been performed, or by having non-attorney employees perform such estimates to his specifications.[1] These bills for "closed cases" totaled over $1.1 million dollars; Sears paid $833,409 before bringing the present litigation.

During this time, Goldstone also submitted monthly the money he had collected for Sears on active files, and Sears paid the forty-five percent contingency fee. Despite the 1987 Agreement and without Sears's knowledge, Goldstone also pocketed a portion of the money he collected from Sears debtors as reimbursement for court costs before sending the balance to Sears each month.[2]

In mid–1992, Sears employees began to question Mr. Goldstone's billings when they noticed that his bills exceeded the amount he had collected for Sears for several months. Goldstone explained that many of the bills were not for ongoing cases, but for closed cases from the Sudalter firm. He represented that Sears had not previously paid for these cases. At a meeting in the summer of 1992, Goldstone showed a box of files to Karen D'Angelo, the Sears special accounts manager with whom he had spoken earlier, explaining that the markings meant that Sears had not paid for these cases. D'Angelo confirmed that the account numbers on the files represented genuine Sears collection accounts that had been placed with the Sudalter firm, but did not challenge Goldstone on the meaning of the file folder markings. Goldstone did not say that this was just his interpretation of the file folder markings, or

that the markings could be interpreted differently.

Later that year, higher-ranking Sears executives inquired about the increase in expenses for attorney's fees that Goldstone's "closed cases" bills represented, asking the office to "stop" Goldstone's bills. Renee Matta, D'Angelo's supervisor, wrote an e-mail explaining her understanding of the situation.

> This is not something that I can "stop." Attorney Goldstone is charging for fees and costs that were never billed to us over an extended period of time for services rendered by Attorney Sudalter.... I merely asked him to get the bloodletting over with in 92 if possible. He was in today and brought in the "last" of the culling process. It should peak out at $605,000 for the year! All of these cases should have (at some time) been billed to Sears—but were not. Mrs. Sudalter has said that she had intended to bill Sears—but didn't.... I have reviewed many of the accounts and find the bookkeeping to be in order. Mr. Goldstone merely followed the intent of the contract when he was told that accounts that have not been "paid" should not remain in his portfolio....

Although the e-mail states that Matta "reviewed many of the accounts," the record reveals that such review was only to determine whether the account numbers accurately referred to Sears debtors. As Matta explained,

---

1. In each case, the amount of attorney time that Goldstone estimated was minimal, almost always less than an hour.

2. According to Goldstone, the firm's practice of skimming reimbursement for costs off the top of collections from Sears debtors was dictated by the law of champerty, which generally requires that clients remain liable for expenses even in contingency fee arrangements. According to Goldstone, a non-attorney Sears employee agreed with his interpretation. In fact, however, S.J.C. Rule 3:05, governing contingent fees for Massachusetts attorneys, provides, "Contingent fee arrangements concerning the collection of commercial accounts ... made in accordance with usual practices in respect of such cases shall not be regarded as champertous and shall not be

subject to," *inter alia*, the requirement that "the client, in any event, is to be liable for expenses and disbursements." Regardless, the 1987 Agreement and DR 9–102 absolutely forbid Goldstone's unilateral reimbursement of costs from client funds without the client's knowledge or consent, even if he were entitled to such reimbursement.

Under the Massachusetts Rules of Professional Conduct, effective January 1, 1998, which repeal former S.J.C. Rule 3:05 and the disciplinary rules, attorneys may make payment of costs and expenses contingent on success for all clients. *See* Rule 1.8(e)(1). Naturally, the requirement to keep client funds separate remains in effect. *See* Rule 1.15.

[O]n some invoices it was difficult for us to determine what we were paying for. The accounts were very, very old.... I recall [my employees] getting some clarification [from Goldstone] on some account numbers.... I do recall them getting some clarification on account names to substantiate the name that we had been billed for.

Other than the review to see if the account numbers matched those of Sears's debtors, Matta relied on Goldstone for her information. Apart from reviewing the account numbers, Sears employees did not independently review the law firm's records to determine whether the amounts Goldstone billed for attorney time or costs were accurate; they trusted that Goldstone, as their attorney, had a basis for those figures.

Believing that Goldstone had a basis for his bills and that the contract required the payments, Sears employees did not question Goldstone again until the bills continued to arrive throughout 1993 and early 1994 without any apparent end in sight. When Sears again began to question the bills and to delay its payments to Goldstone, he took action. Goldstone threatened to deduct his fees from money collected from Sears's debtors. He also noted in a letter that he and the firm felt "restrained from acting in our client's best interest because of" Sears's failure to pay. In 1994, Sears finally terminated its relationship with Goldstone & Sudalter and brought the present action for an accounting to determine whether Goldstone's bills were in order. Goldstone counterclaimed for the unpaid balance.

At deposition, Mrs. Sudalter testified that she performed bookkeeping duties for her husband's firm and was intimately familiar with its billing practices. She testified that Sears did not owe anything on the old files, i.e. files in dead storage of whatever year, and that it was impossible to determine from the outside of a folder whether Sears had paid a fee for the file. Although he had never discussed with Attorney Sudalter the system for determining whether Sears had paid a fee or reimbursed costs for a particular case, Goldstone's position was that the costs were self-evident from a review of the case jacket. Likewise, Goldstone contends,

the fee could be reliably estimated by reviewing the work performed and determining, based on his experience, how much time each task ordinarily required.

Mrs. Sudalter noted that, after 1987, Sears was not obligated to reimburse for costs, and that she did not record Sears's payment of the forty-five percent contingency fee on the outside of each file folder because it would have been time-consuming. Mrs. Sudalter also testified that the red stickers that many of the file folders contained marked those cases as "closed," that the firm's "closed" cases were either fully paid up or uncollectible, and that the law practice never intended to submit any further bills to Sears on "closed" cases. A preliminary review of a mere fourteen case files demonstrated that Sears had already paid legal fees for work performed on some substantial portion of the cases, a fact which Goldstone admitted at his deposition.

Following these depositions, Sears amended its complaint, alleging a fraudulent double-billing scheme by Goldstone. Sears asked for damages of $833,409 to recover all the fees it had paid for old cases, and also demanded attorney's fees under Mass. Gen. Laws ch. 93A for "unfair or deceptive trade practices." On cross-motions for summary judgment, the district court ruled for Sears, finding Goldstone in breach of his contract and fiduciary duty as an attorney and in violation of Mass. Gen. Laws ch. 93A, § 2. The district court awarded the full $833,409 in damages and $112,000 in attorney's fees.

■ Our review of the district court's grant of summary judgment is de novo. *Swain*, 117 F.3d at 5.

### II. Goldstone's Obligations In Billing Sears

■ The attorney-client relationship is "highly fiduciary" in Massachusetts. *Hendrickson v. Sears*, 365 Mass. 83, 310 N.E.2d 131, 135 (1974); *Dunne v. Cunningham*, 234 Mass. 332, 125 N.E. 560, 561 (1920). To state that elastic truism does not answer the question of the level of duty which is imposed on a lawyer in billing clients. The district court found that a particularly high level of

duty was required here, analogizing this case to situations where the attorney has a separate business relationship with a person while simultaneously representing that person as counsel. *See Goldman v. Kane,* 3 Mass.App.Ct. 336, 329 N.E.2d 770 (1975). To the extent that the district court's opinion might be misunderstood to suggest that the separate "business transaction" rules in *Goldman* apply to ordinary billing arrangements between a lawyer and client when the lawyer's sole relationship with the person who is the client is as counsel, we clarify that this is not the law.

■ To the extent that the district court was ruling that the more stringent *Goldman* business transaction rules apply when an attorney purchases a practice and subsequently bills for services rendered earlier by that practice, we need not and do not reach that issue. We leave that issue more appropriately to the Massachusetts courts to decide in some future case.[3] We affirm on the basis that the summary judgment record shows no dispute of material fact that Goldstone violated the usual duties owed by Massachusetts lawyers when billing clients and that he did so in a manner which was in breach of his contract and in violation of Mass. Gen. Laws ch. 93A.

■ In *Goldman,* an attorney sued his client to enforce a loan agreement whose terms greatly favored the attorney. The loan agreement was an independent business transaction between the two. In this context, the court declined to enforce the agreement: "When an attorney bargains with his client in a business transaction in a manner which is advantageous to himself, and if that transaction is later called into question, the court will subject it to close scrutiny." *Id.* 329 N.E.2d at 773. When there are such business transactions, the fiduciary relationship requires a series of heightened duties in light of the heightened risks. Specifically, these heightened duties require the lawyer to meet the burden of showing that (1) the transaction "was in all respects fairly and equitably conducted" and that (2) the client had received "independent advice in the matter or else receive[d] from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger." *Id.*[4] The *Goldman* rule has been adopted by the Supreme Judicial Court. *See In re Stern,* 425 Mass. 708, 682 N.E.2d 867, 871 (1997) (finding an attorney's entering into a business transaction with a client without urging an independent legal opinion a violation of DR 5–104 and DR 1–102); *Israel v. Sommer,* 292 Mass. 113, 197 N.E. 442 (1935) (holding a trust agreement favoring an attorney invalid for failure to obtain disinterested advice); *Hill v. Hall,* 191 Mass. 253, 77 N.E. 831 (1906) (holding a sale invalid for failure to obtain disinterested advice). The new Massachusetts Rules of Professional Conduct restate the *Goldman* requirements as a separate rule, *see* Rule 1.8,[5] and essentially the same rule has been proposed by the ALI, *see Restatement (Third) of the Law Governing Lawyers* § 207 (Proposed Final Draft No. 1, March 29, 1996) (relying on *Goldman* and similar cases to require independent legal advice for business transactions between law-

---

3. The new Massachusetts Rules of Professional Conduct, effective January 1, 1998, do not expressly address whether the business transaction rules should be applied to such a situation. *See* Rule 1.8 (governing attorney-client business transactions); Rule 1.17 (governing the sale of a law practice).

4. Under *Goldman,* a prudent attorney would refrain from attempting personally to give the required disinterested advice. The attorney in *Goldman* had advised his client not to enter into the loan agreement, yet the court found that "in the circumstances of this case, [the attorney's] full disclosure and his advice were not sufficient to immunize him from liability." *Id.*

5. Rule 1.8(a) provides:

"A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

"(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

"(3) the client consents in writing thereto."

yers and clients).[6]

■ Business transactions other than fee agreements between lawyers and clients create special conflicts of interest that require the precaution of independent advice. However, attorneys, like fiduciaries generally, are entitled to receive compensation for their services, and may pursue their legitimate interests in receiving payment in the ordinary fashion. Thus, seeking to enforce a valid fee contract is an exception to the general requirement that fiduciaries subordinate their interests to those of their clients. *See generally Restatement (Second) of Agency* §§ 441, 463 (1957) (providing that a principal has a duty to compensate his or her agent and that an agent may take action in the case of breach); *Restatement (Third) of the Law Governing Lawyers* §§ 29, 29A (P.F.D. No. 1, March 29, 1996) (providing that a client has an obligation to compensate his or her lawyer and that a lawyer may enforce a valid fee contract).

Massachusetts law does not regard the ordinary fee contract as a "business transaction between lawyer and client" subject to the special requirements of *Goldman. See Coupounas v. Madden,* 401 Mass. 125, 514 N.E.2d 1316 (1987) (affirming a client's duty to pay a lawyer-accountant and refusing to hold invalid notes that client signed for failure to obtain independent legal advice); *see also Restatement (Third) of the Law Governing Lawyers* § 207 cmt. a (P.F.D. No. 1, March 29, 1996) ("The requirements [for business transactions] do not apply to ordinary client-lawyer fee agreements...."). It would make little sense to require an attorney, embarking on representation of a client and entering into an ordinary fee agreement, to advise the client to hire another attorney to give "independent legal advice" concerning that fee agreement.

■ Nevertheless, this case still turns on the rules for the regulation of attorney's fees which Massachusetts has established to protect clients and to preserve the integrity of the bar. Massachusetts has established that a lawyer always bears the burden of proof in any proceeding to resolve a billing dispute, whether the lawyer appears as a plaintiff seeking to recover a fee or as a defendant in a suit for a refund. *First National Bank of Boston v. Brink,* 372 Mass. 257, 361 N.E.2d 406, 410 (1977) (suit for an accounting and refund of a large fee for tax advice); *Smith v. Binder,* 20 Mass.App.Ct. 21, 477 N.E.2d 606 (1985) (suit for an accounting and refund of a portion of large retainer fee); *see also Restatement (Third) of the Law Governing Lawyers* § 56(2) (P.F.D. No. 1, March 29, 1996) (following the *Brink* rule). As the *Restatement* notes, "A lawyer ... will usually have better access than a client to evidence about the lawyer's own services...." *Id.* at § 56 cmt. c. That concern is particularly salient in this case, where the items of evidence that Goldstone presents consist of cryptic handwritten notations on several thousand old file folders.

■ To satisfy an attorney's burden of proof under Massachusetts law, he or she must provide more than purely speculative evidence to support a claim that a client owes a particular charge in order to defeat a properly supported motion for summary judgment. *See Beatty v. NP Corp.,* 31 Mass.App. Ct. 606, 581 N.E.2d 1311, 1314–16 (1991) (finding evidence of an agreement by a client to pay a performance bonus too "isolated" to support attorney's claim); *accord Davis v. Glenville Haldi, P.C.,* 148 Ga.App. 842, 253 S.E.2d 207, 208 (1979) (rejecting attorney's claim where he introduced "no evidence indicating the amount of time spent on the case or the amount of work he performed," but

---

6. As proposed by the ALI, *Restatement* § 207 provides:

"A lawyer may not participate in a business or financial transaction with a client, except a standard commercial transaction in which the lawyer does not render legal services, unless "(1) the client has adequate information about the terms of the transaction and the risks presented by the lawyer's involvement in it;

"(2) the terms and circumstances of the transaction are fair and reasonable to the client; and

"(3) the client consents to the lawyer's role in the transaction under the limitations and conditions provided in § 202 [concerning client consent to conflicts of interest] after being encouraged, and given a reasonable opportunity, to seek independent legal advice concerning the transaction."

only the attorney's own opinion that a prospective contingency fee would be $25,000). Scanty or speculative evidence concerning the value of legal services is insufficient to create a genuine issue for the trier of fact. *See Beatty,* 581 N.E.2d at 1315–16 (summary judgment appropriate); *accord Davis,* 253 S.E.2d at 208 (directed verdict appropriate). Placing the burden of proof on the attorney is sensible in light of the difficulty of monitoring the attorney's services.

■ While Sears is the moving party, it has supported its summary judgment motion by pointing to undisputed material facts in the record. Now, the burden of proof rests with Goldstone to present clear evidence that the bills are owed by Sears. "Once the moving party has properly supported her motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact could reasonably find in his favor." *Denovellis v. Shalala,* 124 F.3d 298, 305–06 (1st Cir.1997). Goldstone has failed to demonstrate that a trier of fact could find in his favor. The evidence he presented to substantiate the bills he submitted for over 15,-000 files consists entirely of his own interpretation of the handwritten markings contained on the outside of the files and his own estimates of the amount of time that Sudalter spent on cases stretching over fifteen years. He lacks personal knowledge that Sudalter had not already billed Sears on these accounts or had determined that they were not to be billed.

■ On the summary judgment record, Mrs. Sudalter is the only competent witness to her late husband's bookkeeping practices; Goldstone has no personal knowledge regarding the firm's records and never even met Attorney Sudalter.[7] *See* F.R.C.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge ... and shall show affirmatively that the affiant is compe-

tent to testify to the matters stated therein."). Mrs. Sudalter has testified that it is impossible to determine from the old file folders whether Sears owed any money for attorney's fees and costs, that the Sudalter firm never intended to submit further bills to Sears for files in "dead storage" and that the red stickers on old files indicate that the matters were considered "closed." Goldstone's only response is to say that Mrs. Sudalter is biased against him. But that does not satisfy his burden to "set forth specific facts showing that there is a genuine issue" for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Denovellis,* 124 F.3d at 305–06. A party cannot create an issue for the trier of fact " 'by relying on the hope that the jury will not trust the credibility of witnesses.... There must be some affirmative evidence....' " *Dragon v. Rhode Island Dep't of Mental Health, Retardation and Hospitals,* 936 F.2d 32, 35 (1st Cir.1991) (quoting Wright and Miller, *Federal Practice and Procedure: Civil 2d* § 2527 (1st ed.1971) (misquoted as § 2528 in *Dragon* )).

■ Goldstone nonetheless urges us to vacate the summary judgment for Sears and remand the case in order to require Sears to establish its injury by showing the impropriety of his bills for each of over 15,000 files. As the district judge noted, "[i]t would be perverse for the court to hold Sears ... to a standard the [defendant] himself could never achieve." This case illustrates the reasons for the Commonwealth's rule that a lawyer always bears the burden to prove that he is owed compensation under a valid fee agreement. The burden of proof was not on Sears; it was on Goldstone. He has had his opportunity to satisfy his burden. While Sears's record keeping practices were sloppy at best and Sears does not evoke much sympathy, it is the lawyer's burden to justify

7.  Goldstone also calls our attention to the affidavit of Frederick Casson, which was stricken by the district court. Goldstone failed to disclose Casson's identity pursuant to F.R.C.P. 26(a) at the outset of the litigation. The district court ordered the affidavit stricken, the sanction established by F.R.C.P. 37(c)(1). The district court's

decision was well within its discretion. *See Rivera–Flores v. Bristol–Myers Squibb Caribbean,* 112 F.3d 9, 14 (1st Cir.1997) ("Our review of the district court's discovery-related decisions is for abuse of discretion, and we will intervene in such matters only upon a clear showing of manifest injustice.").

amounts billed.[8] Because Goldstone has failed to produce evidence that Sears actually owed Sudalter any of the $833,409 that represents Sears's payment on the closed files, the district court's damage award was proper.[9]

### III. Chapter 93A

■■■ The district court found that the undisputed facts established that Goldstone's conduct was "unfair or deceptive," in violation of Chapter 93A. This Chapter 93A finding, and the finding that Sears suffered harm from that violation, entitled Sears to an award of attorney's fees. Mass. Gen. Laws ch. 93A, § 11; *Nasco v. Public Storage, Inc.*, 127 F.3d 148, 149–50 (1st Cir.1997).

■■■ Chapter 93A applies to attorneys, and unlawful billing or other unethical conduct can constitute a Chapter 93A violation. *See Guenard v. Burke*, 387 Mass. 802, 443 N.E.2d 892, 896 (1982) (reliance on an illegal contingent fee agreement to collect a fee violates Chapter 93A); *Brown v. Gerstein*, 17 Mass.App.Ct. 558, 460 N.E.2d 1043, 1051–52 (1984) (lawyer's unethical deceit toward his clients concerning the status of litigation violated Chapter 93A). To establish that no genuine issue of material fact existed on the Chapter 93A claim, Sears is required to show that the undisputed facts reveal that Goldstone's conduct "falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or is 'immoral, unethical, oppressive or unscrupulous.'" *Cambridge Plating Co. v. Napco,*

*Inc.*, 85 F.3d 752, 769 (1st Cir.1996) (quoting *PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)).

■■■ Goldstone's breach of his obligations in these circumstances is sufficient to establish a Chapter 93A violation. *Cambridge Plating*, 85 F.3d at 769; *Doucette v. Kwiat*, 392 Mass. 915, 467 N.E.2d 1374 (1984) (finding that an attorney's collection of a fee to which he was not entitled under his fee agreement violated Chapter 93A). Furthermore, Goldstone admitted to conduct which constitutes unethical behavior in skimming his costs off the top of Sears collections without Sears's knowledge or consent and in violation of his contract. *See* DR 9–102. Violations of the rules governing the legal profession are evidence of legal malpractice, and are also relevant in Chapter 93A determinations. *See Fanaras Enterprises, Inc. v. Doane*, 423 Mass. 121, 666 N.E.2d 1003, 1006 (1996); *Brown*, 460 N.E.2d at 1050, 1052 n. 22.

The district court's finding of a Chapter 93A violation does not depend on whether Goldstone knowingly devised a scheme to defraud Sears or was merely opportunistic and reckless in making the assumptions he did regarding the files. Whether or not Goldstone's conduct was knowingly fraudulent, the record clearly shows that his conduct fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Cambridge Plating*, 85 F.3d at 769 (citation and internal quotation marks omitted). Sears did not

8. Goldstone argues that a ruling for Sears means that no attorney can recover for his work in the absence of contemporaneous time records. The issue is not whether an attorney may charge fees in the absence of contemporary time records. It is whether a lawyer without personal knowledge that a bill is owed has produced sufficient admissible evidence to survive summary judgment that the obligation in fact exists. We also note that in the purchase of a law practice, the lack of adequate billing records to support accounts receivable can, of course, be reflected in the purchase price.

9. Goldstone's attorney contended in oral argument that some of the $833,409 in bills that Sears paid were not for closed files, but for new work that Goldstone performed. However, the district court had ordered Goldstone to make an accounting of invoices he submitted for fees and costs that he claimed were owing to his deceased partner, Eldon B. Sudalter, and according to the district court, "[t]he parties agree[d] that the relevant sum charged to and paid by Sears [was] $833,409. Goldstone & Sudalter's own accountant provided that figure as "an accounting of all charges ... for 'closed accounts'...." Goldstone's attorney did not dispute that figure at the damages hearing, but instead contended that Sears had not shown that all the files had previously been billed. Given Goldstone's burden, that fact is not material to the damages issue. Goldstone has not sustained his argument that part of the $833,409 judgment covers bills for work that he himself performed, rather than bills for Sudalter's work.

seek the double or treble damages that are available for knowing violations of Chapter 93A, *see* Mass. Gen. Laws ch. 93A, § 11, so the issue of Goldstone's knowledge is not a "genuine issue of material fact" that would defeat summary judgment. The district court's award of attorney's fees of $112,000 was warranted. Goldstone does not dispute the amount of attorney's fees awarded.

The district court's grant of summary judgment, damages and attorney's fees is *affirmed.*