## COMMONWEALTH vs. ARTHUR DAVIS.

Middlesex. October 3, 1988. — December 14, 1988.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury. *Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions.

A criminal defendant's confession to murder, made in the third person, attributing actions to the defendant's alter ego, was properly admitted in evidence where the record supported the judge's conclusion that the defendant's statements were the product of a rational intellect, and where the police interrogation of the defendant, as to the third person's actions, did not of itself indicate that the confession was involuntary. [578-581]

Sufficient evidence was introduced at the trial of a homicide case to warrant a verdict of guilty of murder in the first degree based on either deliberate premeditation or extreme atrocity or cruelty. [581-582]

The fact that extreme cold may have contributed to a murder victim's death did not relieve a defendant charged with the homicide of responsibility for his conduct. [582]

There was no merit to a criminal defendant's argument that if he acted in anger in killing the victim he could not have had the "cool reflection" required for a conviction based on premeditation. [582]

At a murder trial the judge did not err in refusing the defendant's request for a jury instruction on voluntary manslaughter where the evidence was insufficient to raise the issue of reasonable provocation or sudden combat. [583-584]

No error requiring reversal of a first degree murder conviction appeared in the judge's instructions to the jury on the element of malice. [584-585]

No reason appeared for the court to exercise its power under G. L. c. 278, § 33E, in favor of a defendant convicted of first degree murder. [585]

INDICTMENT found and returned in the Superior Court Department on March 14, 1985.

A pretrial motion to suppress evidence was heard by *Robert W. Banks*, J., and the case was tried before him.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Fern L. Nesson*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree, the defendant appeals, alleging error in (1) the admission of his statements to the police; (2) the denial of his motion for a required finding; (3) the denial of his request for an instruction on voluntary manslaughter; and (4) the instructions on malice. The defendant asks that we exercise our power under G. L. c. 278, § 33E, and reduce the verdict to manslaughter. We conclude that there is no reversible error, and no substantial likelihood of a miscarriage of justice. Therefore we affirm the conviction. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence in the light most favorable to the Commonwealth.[1] At approximately 9:30 A.M. on February 10, 1985, the body of the victim was discovered in an outdoor stairwell at Lowell City Hall. The victim was a twenty-three year old married woman who had given birth to a baby nine days earlier. The victim was nude, lying up against a wall in a pool of blood. Her head, thighs, and stomach were covered with blood. There was a large gash in her forehead resulting from a forceful blow with a blunt instrument or caused "by crushing the victim's head against the curbstone" with enough force and torque to split the skin to the bone and tear it away from the bone for about three inches. There was a blow to the back of the head and another on the right side of the head, which caused bruising and hemorrhaging in the brain. The extreme cold (nine or ten degrees Fahrenheit) in which the victim was left also may have contributed to her death. The victim had been struck forcefully across the back with a rodlike instrument and she sustained bruises and scratches consistent with having crawled about while still conscious. She had been dead for several hours.

---

[1] The defendant filed a motion for a required finding of not guilty at the close of the Commonwealth's case. We therefore consider the evidence introduced up to the time the Commonwealth rested its case. See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 (1979); *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976).

The Lowell police learned from a person who knew the defendant that the defendant frequented the area of the murder, but they were unsuccessful in locating the defendant. On February 12, at approximately 6 P.M., the defendant telephoned the police and told an officer that he had learned that the police were looking for people who had been in the area of the murder. The defendant said he had been there with a Mark Neal and that they had seen a suspicious man in front of City Hall. He said that he and Neal became frightened and fled. The officer asked the defendant if he would come to the station and make a statement, and the defendant agreed.

At the station, the defendant met with an Inspector Guilfoyle. The defendant told Guilfoyle that he was with John Barnes on February 9 and intended to use the pay telephone in front of City Hall. The defendant stated that while using the telephone he observed a suspicious individual whom he described.[2] He also described a rod and bag carried by this individual. The defendant then assisted the police in drawing a composite picture of the individual. The defendant looked through the police photographs but did not make an identification. The defendant left the station.

On February 13, Guilfoyle got in touch with Barnes to get a further description of the suspicious individual. Barnes denied he was with the defendant on February 9. Because of discrepancies between Barnes's statement and the defendant's, the police asked both Barnes and the defendant, separately, to come to the police station. The police recited the Miranda warnings and had the defendant read a Miranda card aloud to the police. The defendant said he understood the warnings and signed the card. The officers witnessed the signature.[3]

The defendant conferred with Barnes for a few minutes. The defendant then told the police he lied when he said he was with Barnes.[4] He said he would now tell the truth, and described

_____

[2] The description resembled the appearance of the defendant.

[3] The judge found that the defendant was not under arrest at the time of the warnings, but that recitation of the warnings was a "matter of normal cautionary police procedure."

[4] At trial, Barnes said that during the evening of February 10, the defendant

approaching the steps of City Hall and seeing a naked, bloody woman there. He placed the time of the murder at 12:30 A.M. The defendant also accurately diagrammed the scene and the position of the body for the police and gave the police a brief personal history. The statement was typed on a victim-witness form, and the defendant read it and signed it.

The officer then asked why the defendant, who said he was a licensed practical nurse, had not tried to help the victim. The defendant changed his story and said he had seen a man trying to have sex with a body. The man saw the defendant and threatened the defendant and the defendant's family if the defendant said anything. The defendant also changed the time of the incident from 12:30 A.M. to 2 A.M. During this interview, the defendant interrupted the officer once to say, "You won't find my fingerprints on her" and three times to say, "The hair won't match mine."

The officer who coordinated the investigation of the murder, Lieutenant LaMothe, took over the interview of the defendant. The Miranda warnings were repeated, and during the course of this interview, the defendant told the police, "I banged her head on the cement." [5]

1. *The defendant's custodial statements.* The defendant argues that the judge erred in admitting in evidence the defendant's confession to police officers. He asserts that the interrogating officer used a psychological stratagem to break down "his normal will to protect himself and render[] [him] indifferent

---

told him, "I killed her for a red and white polka dotted dress."

At trial, but not at the hearing on the motion, Barnes said he heard the defendant refer to himself as Skipper. Barnes also said that the defendant carried a maroon bag and a purple duffle bag. These items were similar to those described by the defendant as having been carried by the suspicious individual he described to police in the first interview. Items matching the defendant's description were found in the defendant's home.

[5] On February 10, before he had spoken to the police, the defendant told a coworker at his place of employment "he was late for work because there was a murder in Lowell[,] . . . that the police were . . . asking people if they had seen anything[,] . . . that he was asked too, and that is why he was late." At lunch, the defendant asked the same worker "what [she] would do if [she] witnessed a murder." He also asked her if she "would tell if [she] knew who did it." The witness asked the defendant "if he had anything to do with it." The defendant "laughed [and] said no one would ever know."

to protect himself." *Commonwealth* v. *Paszko*, 391 Mass. 164, 178 (1984), quoting *Pea* v. *United States*, 397 F.2d 627, 634 (D.C. Cir. 1967).[6] The defendant argues that, because LaMothe used the nickname "Skipper," spoke to the defendant in the third person, and interrogated the defendant as to what Skipper did, the defendant's "will [was] overborne and his capacity for self-determination [was] critically impaired." *Culombe* v. *Connecticut*, 367 U.S. 568, 602 (1961). The defendant asserts that "[a] confession made in the third person, attributing criminal acts to an alter ego of the confessor . . . bears on its face conclusive indicia of irrationality and the breaking of its maker's will to protect himself." We do not agree.

At the time of the interrogation, the defendant was nineteen years old. He attended school through the tenth grade and thereafter earned a high school equivalency certificate. The defendant was of above average intelligence. The defendant had a history of psychiatric treatment and was diagnosed as suffering from "bipolar disorder, mixed type with underlying strong borderline personality character disorder."[7] LaMothe had no knowledge of the defendant's psychiatric history until the conclusion of the interrogation, at which point the defendant informed LaMothe of his prior psychiatric treatment. The judge

---

[6] In support of his motion to suppress, the defendant argued that all his statements to the police were custodial. He admitted that he had been given Miranda warnings but argued that his statements should be excluded because they were involuntary. He also moved to suppress the physical evidence obtained through use of the allegedly involuntary statements. The motion was denied "with the exception of defendant's statements regarding the location of his gym bag," which had been made in response to questioning after the defendant exercised his right to remain silent.

On appeal, the defendant argues only that the portion of the interrogation conducted by LaMothe, which the judge found to be custodial, should have been excluded as involuntary. We deem all other issues waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Commonwealth* v. *Cundriff*, 382 Mass. 137 (1980), cert. denied, 451 U.S. 973 (1981). We have nevertheless reviewed the issues raised by the motion, pursuant to G. L. c. 278, § 33E. We conclude that there is no error and hence obviously no substantial likelihood of a miscarriage of justice. The defendant correctly waived these issues.

[7] Bipolar disorder is the term now used to describe manic-depressive illness.

found that, from February 10 to February 14, the defendant
followed his normal daily routine and that he worked full time
during that period. The judge found that, between February
10 and February 14, the defendant was not under the influence
of or suffering from a major psychotic illness.

The defendant was at the police station approximately nine
hours,[8] during which time he was given water and tonic, ciga-
rettes, and bathroom privileges, and was offered food, which
he refused. He was not fatigued. The judge found that the
defendant was not "unduly nervous" and was "coherent and .
. . unaffected by his surroundings." The judge determined that
the defendant was alert and cooperative. The judge found that
the statements were not the product of intimidation or coercion.

LaMothe knew from the defendant's mother that the defend-
ant had a nickname, "Skipper." During the interrogation,
LaMothe addressed the defendant alternately as Skipper and
as Arthur. The defendant told LaMothe that he preferred to be
called Arthur. LaMothe showed the defendant the Miranda
card he had signed and asked him if he remembered his rights.
The defendant replied that he did. LaMothe pointed out to the
defendant that he had not asked for a lawyer and had not asked
to leave. He asked the defendant why he had not left. LaMothe
described all the discrepancies in the stories the defendant had
given so far and asked him to explain what had really happened
on the night of February 9.

LaMothe asked questions as to what the defendant had done,
and what Skipper had done, sometimes speaking of Skipper
in the third person. The defendant replied, sometimes referring
to himself as Skipper and sometimes using the first person.
He also stated that he and Skipper were the same person. He
stated that Skipper had taken off the victim's clothes and hit
her with his bag. He then said, "I hit her head against the
cement."

The defendant described generally what the victim had been
wearing, and stated that her underpants had been white and

---

[8] The judge found that the custodial interrogation with LaMothe began
at approximately 2 A.M. and concluded at approximately 3.30 A.M.

bloody. He accused LaMothe of being "sneaky" in asking about the color of the victim's pants. He said that the police might find Skipper's fingerprints on the victim's shoulders and neck.

At the conclusion of this interview LaMothe asked the defendant if he would dictate and sign a typed statement. The defendant refused and asked to see his mother. At that time, he told LaMothe that he had had psychiatric care in the past. The police called his mother and, when she arrived, told her that they were planning on charging the defendant with murder.

A confession, to be admissible, must be "the product of a free intellect," *Townsend* v. *Sain*, 372 U.S. 293, 308 (1963), "free and voluntary," *Malloy* v. *Hogan*, 378 U.S. 1, 7 (1964), "the product of a rational intellect and a free will," *Blackburn* v. *Alabama*, 361 U.S. 199, 208 (1960), and a "meaningful act of volition," *id*. at 211. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 99 (1982). The judge applied those standards and concluded that the defendant's statements were the "product of a rational intellect." The judge's subsidiary findings are supported by the evidence and his application of constitutional principles to the facts as found is correct.[9] See *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977); *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982).[10] The record indicates that the defendant made exculpatory statements, refused to dictate an incriminating statement, and otherwise made an effort to protect himself. Contrary to the defendant's assertions, the interrogation by itself does not "bear conclusive indicia of irrationality and the breaking of [the defendant's] will."

*2. Motion for a required finding of not guilty.* The defendant argues that the evidence is insufficient to warrant a verdict of

[9] We reach our conclusion without regard to the judge's finding that "when speaking, the defendant has a habit or style of referring to himself in the third person. This has been noted by friends and teachers who consider this to be his style of speaking." In his brief, the defendant correctly points out that at the hearing on the motion only the defendant's art teacher for the sixth, seventh, and eighth grades said that the defendant spoke in the third person.

[10] The judge did allow the defendant's motion to suppress all references in the interrogation to the defendant's sexual preference.

guilty on so much of the indictment as charged murder in the first degree.[11] The judge instructed the jurors that they could consider murder in the first degree based on either deliberate premeditation or extreme atrocity or cruelty or both. There was no error. The number of the injuries, the use of two different weapons, and the brutality of the beating are sufficient, if believed, for the jurors to conclude that the murder was committed with either deliberate premeditation or extreme atrocity or cruelty or both. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981); *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356 (1957). See also *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970).

The defendant asserts that, because the extreme cold also contributed to the victim's death, the verdict of murder in the first degree is not warranted. We do not agree. "The longstanding rule in this Commonwealth is that '[i]f a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result.'" *Commonwealth* v. *Fernette*, 398 Mass. 658, 668 (1986), quoting *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861). The fact that the extreme cold also contributed to the death does not relieve the defendant of responsibility for his conduct.

Last, the defendant contends that, if he acted in anger, he did not act with the "cool reflection" which is required for a conviction based on deliberate premeditation. See *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978). There is no merit to this argument. "Cool reflection" merely requires that "the purpose [be] resolved upon and the mind determined to do it before the blow is struck[;] then it is, within the meaning of the law, deliberately premeditated malice aforethought." *Commonwealth* v. *Tucker*, 189 Mass. 457, 494 (1905).[12]

---

[11] At trial, the defendant did not so limit his motion.

[12] The defendant argues that his case is controlled by *Commonwealth* v. *McInerney*, 373 Mass. 136 (1977), and therefore a conviction of murder in the first degree is unwarranted. We do not agree. In *McInerney*, the

3. *Request for an instruction on manslaughter*. The defendant contends that the trial judge erred in refusing his request for an instruction on voluntary manslaughter.[13] The defendant correctly states that if any view of the evidence would warrant a verdict of guilty of manslaughter, rather than murder, it is reversible error for the judge to refuse a manslaughter instruction. *Commonwealth* v. *Martinez*, 393 Mass. 612 (1985). We conclude that there was no error in refusing an instruction on voluntary manslaughter in this case.

The essence of the defendant's claim is that during the interrogation the defendant said that "Skipper" hit the victim because he was angry, and that if the victim pulled "Skipper's" hair that would make "Skipper" angry.[14] Those statements are insufficient to raise the issue of reasonable provocation or sudden combat. "Speculation that there may have been combat or provocation between the victim and the defendant is not enough to require a [voluntary] manslaughter instruction." *Commonwealth* v. *DeArmas*, 397 Mass. 167, 171 (1986). "There must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980).

Contrary to the defendant's suggestion, "not all physical contact . . . is sufficient to require a manslaughter instruction even though the victim initiated the contact." *Commonwealth*

---

the defendant inflicted a single injury with a weapon of opportunity (cord). He did not bring a weapon to the scene and he did not inflict a number of blows. The circumstances of that homicide thus differ from the circumstances of this case.

[13] The defendant concedes that he failed to meet the formal requirements of Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979), but contends that he saved the issue for appeal in substance if not in form. See *Commonwealth* v. *Matos*, 394 Mass. 563, 565 (1985). The Commonwealth does not argue otherwise.

[14] There is no evidence that the victim pulled the defendant's hair. Although hair was found in the victim's hands, that hair was determined to be the victim's own hair.

v. *Garabedian*, 399 Mass. 304, 314 (1987). See, e.g., *Commonwealth* v. *Brown*, 387 Mass. 220, 227 (1982) (evidence that victim choked defendant with defendant's shirt inadequate provocation where defendant stabbed victim twenty-seven times); *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973) ("It is an extravagant suggestion that scratches by the [victim] could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument"). The judge correctly denied the defendant's request for an instruction on manslaughter.

4. *The instruction on malice.* The defendant argues that a portion of the jury instructions on malice requires reversal of his conviction. In support of his conclusion, the defendant focuses on one sentence in the instructions on malice. "We, however, view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). We do not analyze a fragment of a charge and subject it "to scrutiny as though each fragment had to stand or fall on its own without the aid of the remainder of the charge." *Commonwealth* v. *Whooley*, 362 Mass. 313, 319 (1972). We do not consider "isolated verbal phenomena" apart from their context. See *Charles A. Wright, Inc.* v. *F.D. Rich Co., Inc.*, 354 F.2d 710, 713-714 (1st Cir.), cert. denied, 384 U.S. 960 (1966). So tested, the instructions do not require reversal.

The judge in a portion of the instructions on malice used the words "with a mind inflamed by recklessness to such an extreme degree that it might rightfully be described as indicating a heart devoid of social duty and fatally bent on mischief, there is proof of malice . . . ."[15] The defendant asserts that the use of the word "recklessness" essentially negated the requirement of intent. That sentence, however, was part of an extended discussion of malice which repeatedly instructed the

---

[15] The defendant's requested instruction number 34 reads as follows: "'Malice' is a state of mind showing a heartless regard [*sic*] for life and safety of others, a mind deliberately bent on mischief, a generally disproved [*sic*], wicked and malicious spirit."

the jurors, in substance, that the fatal blow must be "purposeful and wrongful and not the result of chance or frailty of humanity . . . ." The instructions as a whole clearly conveyed to the jurors that malice required deliberate, intentional acts without legal excuse or palliation. The instructions on malice do not require reversal of the conviction.

5. *Relief pursuant to G. L. c. 278, § 33E.* The defendant asks that we exercise our power under G. L. c. 278, § 33E, in his favor and reduce the verdict to manslaughter. The defendant asserts that his character, age, and lack of a prior criminal record all suggest that this is "a tragic case in which a minor controversy between strangers exploded into the killing of a human being." *Commonwealth* v. *Keough,* 385 Mass. 314, 320 (1982).[16]

The circumstances of the killing, the number of blows, the injuries inflicted on the victim, and the leaving of the victim unclothed and injured in extremely cold weather do not support a conclusion that the verdict of guilt on the charge of murder in the first degree is against either the law or the evidence in a large or nontechnical sense. See *Commonwealth* v. *Garabedian,* 399 Mass. 304, 316-318 (1987).

*Judgment affirmed.*

---

[16] The defendant bases his argument on a portion of the statement excluded from jury consideration. See note 10, *supra.* The defendant did not specifically adopt LaMothe's hypothetical suggestion as to what might have happened.