NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12500

JAY PATEL & another[1]  vs.  LEO MARTIN & others.[2]

Norfolk.      September 6, 2018. - November 28, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                    & Kafker, JJ.


Practice, Civil, Discovery, Interlocutory appeal.  Attorney at
    Law, Attorney-client relationship.  Privileged
    Communication.



    Civil action commenced in the Superior Court Department on
December 23, 2015.

    A motion for a protective order was heard by Jeffrey A.
Locke, J.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Peter S. Brooks (Gregory M. Boucher also present) for the
defendants.
    David V. Lawler for the plaintiffs.

_____

    [1] Dipika, Inc.

    [2] Seymour H. Marcus, also known as Sy H. Marcus; and Ellen
Rea Marcus, as trustee of the Grossman Munroe Trust.  Leo Martin
and Seymour Marcus are alleged to have acted on behalf of the
Grossman Munroe Trust, but only Ellen Rea Marcus was a trustee.

GANTS, C.J.  The primary issue on appeal is whether a party in a civil case has the right to an immediate appeal from a discovery order under the doctrine of present execution.  The defendants here argue that, after the motion judge ordered the disclosure of communications that they contend are protected from disclosure by the attorney-client privilege, they will be irremediably harmed if they cannot immediately appeal from that order.  We conclude that a party has no such <u>right</u> of interlocutory appeal.  In so holding, we note that a party nevertheless retains two other avenues to seek immediate appellate review of an interlocutory order:  by requesting the trial court judge to report the decision to the Appeals Court under Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996); or by petitioning for redress from a single justice of the Appeals Court under G. L. c. 231, § 118, first par.

Although the appeal is not properly before us under the doctrine of present execution, we exercise our discretion under our superintendence authority to reach the merits and conclude that we must remand the matter to the motion judge for further factual findings.

<u>Background</u>.  We summarize the facts as alleged in the complaint and that are undisputed in the record.  In September 2012, Ellen Rea Marcus, as trustee of the Grossman Munroe Trust

(trustee), executed a purchase and sale agreement with the Masonic Temple Association of Quincy, Inc. (Masons), for the purchase of the Masonic Temple in Quincy (property). Pursuant to a rider to the purchase and sale agreement, the agreement could not be assigned by the trustee without the prior written consent of the Masons. In a separate agreement executed in April 2013, the trustee assigned the rights to the property under the purchase and sale agreement to Jay Patel in return for $100,000; Patel intended to develop a hotel on the property. On September 30, 2013, before the sale of the property closed, a fire caused severe damage to the property. Shortly thereafter, the Masons claimed that they had never consented to the assignment, refused to recognize it, and received over $6 million from an insurance claim arising from the fire. In December 2015, Patel and his "hotel-operating company," Dipika, Inc. (collectively, developer plaintiffs), brought a civil action in the Superior Court against the trustee, Seymour H. Marcus, and Leo Martin (collectively, trust defendants), claiming that they suffered economic damages from the trustee's failure to obtain the required consent for the assignment of the property.

During the course of discovery, the developer plaintiffs noticed the deposition of David Levin, the attorney who represented the Masons with respect to the sale of the property

and who had also routinely represented the trust defendants on real estate legal matters for over twenty years. The trust defendants moved for a protective order to bar Levin from disclosing his confidential attorney-client communications with them, claiming that Levin represented them as well as the Masons in the real estate transaction concerning the property, even though Levin took the position that he had represented only the Masons.

After an evidentiary hearing, the motion judge found that there was an attorney-client relationship between Levin and the trust defendants after the fire regarding insurance claims and third-party claims arising from the fire, but that, with respect to the purchase and sale of the property, Levin represented the Masons, not the trust defendants. He therefore ruled that communications between Levin and the trust defendants before the fire were not protected by the attorney-client privilege.

The trust defendants filed a notice of appeal in the Superior Court seeking review by an Appeals Court panel under the doctrine of present execution and, "in an abundance of caution," also brought a petition in the Appeals Court pursuant to G. L. c. 231, § 118, first par., seeking interlocutory relief from a single justice of the Appeals Court. The single justice stayed action on the § 118 petition until a panel of the Appeals Court decided whether it had jurisdiction of the appeal under

the doctrine of present execution to resolve the discovery dispute arising from the claim of attorney-client privilege. We transferred the appeal to this court on our own motion.

Discussion. 1. Appellate review of interlocutory orders. When a final judgment enters in a civil case in the Superior Court under Mass. R. Civ. P. 54, as amended, 382 Mass. 829 (1981), a party aggrieved has the right to appeal from the judgment to a panel of the Appeals Court. See G. L. c. 231, § 113. As part of that appeal, a party may claim that a judge erred in the entry of various types of interlocutory orders that were issued during the course of the civil case. If a party wishes to seek appellate review of an interlocutory discovery order before the entry of final judgment, however, the party generally has only two alternatives. First, the party may ask the judge under Mass. R. Civ. P. 64 (a) to report the interlocutory finding or order to the Appeals Court, and the judge may do so where he or she concludes that the finding or order "so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court." Mass. R. Civ. P. 64 (a). Second, the party has the right to petition for relief under G. L. c. 231, § 118, first par., from a single justice of the Appeals Court, who may, in his or her discretion, grant the relief. The single justice also has the authority to transfer

the petition to a panel of the Appeals Court, where it will be treated as a full interlocutory appeal. See McMenimen v. Passatempo, 452 Mass. 178, 187 (2008), citing CUNA Mut. Ins. Soc'y v. Attorney Gen., 380 Mass. 539, 540 (1980). But a party has no right under § 118, first par., to bring the petition directly to a panel or to seek review of the single justice's ruling by the panel. See McMenimen, supra at 189-190; Corbett v. Kargman, 369 Mass. 971, 971-972 (1976).

However, in narrowly limited circumstances, where "an interlocutory order will interfere with rights in a way that cannot be remedied on appeal" from a final judgment, and where the order is "collateral to the underlying dispute in the case" and therefore will not be decided at trial, a party may obtain full appellate review of an interlocutory order under our doctrine of present execution. Maddocks v. Ricker, 403 Mass. 592, 596, 598 (1988). See Marcus v. Newton, 462 Mass. 148, 151-152 (2012); Borman v. Borman, 378 Mass. 775, 779-780 (1979).[3] The doctrine is intended to be invoked narrowly to avoid

---

[3] The phrase "doctrine of present execution" appears to derive from Vincent v. Plecker, 319 Mass. 560, 564 n.2 (1946), where this court, in deciding whether an order was appealable as a "final decree," noted, "Though part of a single controversy remains undetermined, if the decree is to be executed presently, so that appeal would be futile unless the decree could be vacated by the prompt entry of an appeal in the full court, the decree is a final one." We first used the phrase "doctrine of present execution" in Borman v. Borman, 378 Mass. 775, 780 (1979).

piecemeal appeals from interlocutory decisions that will delay the resolution of the trial court case, increase the over-all cost of the litigation, and burden our appellate courts.  See Borman, supra at 779.  See also Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374 (1981).

Our doctrine of present execution is similar to the Federal "collateral order doctrine," which permits full appellate review of a small class of collateral interlocutory decisions "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action."  Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 106 (2009), quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 42 (1995).  But, as we note later, the application of the Federal collateral order doctrine has at times varied from our application of the doctrine of present execution.  See note 4, infra.

In civil cases, we have granted "the right to an immediate appeal under the doctrine of present execution where protection from the burden of litigation and trial is precisely the right to which [a party] asserts an entitlement."  Estate of Moulton v. Puopolo, 467 Mass. 478, 485 (2014).  Thus, for example, we allow immediate appeals from an order denying a motion to dismiss by a government official who claims absolute or qualified immunity, because the purpose of such immunity is to

protect public officials from the burden of litigation itself. Duarte v. Healy, 405 Mass. 43, 44 n.2 (1989). If the motion to dismiss were denied in error, the official would have to defend the litigation, which is precisely what the immunity is designed to prevent; even if the erroneous order were ultimately reversed after trial, the right to immunity from suit would still have been "lost forever." Brum v. Dartmouth, 428 Mass. 684, 688 (1999). Similarly, the doctrine has been applied to allow an immediate appeal from the denial of a motion to dismiss under the "anti-SLAPP" statute, G. L. c. 231, § 59H, which was enacted to protect those exercising their rights of petition and speech from lawsuits intended to chill their exercise of those rights by the threat of costly and time-consuming litigation. See Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 157-158 (2017); Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 161 (1998). The interests of defendants under the anti-SLAPP statute cannot be adequately vindicated on appeal from a final judgment, because they will already have suffered the burdens of litigation arising from their exercise of protected rights. See Fabre v. Walton, 436 Mass. 517, 521 (2002).

We have also allowed immediate appeal from an interlocutory order disqualifying a party's counsel in a civil case under the doctrine of present execution. We concluded that an order depriving a party of his or her choice of counsel, if error,

cannot realistically be remedied on appeal from a final judgment. Maddocks, 403 Mass. at 600. Even if the appellate court were to determine that the judge erred in disqualifying the attorney, "[i]n practice, . . . it is unlikely that an appellate court would reverse a judgment and require a new trial in the absence of a demonstration, almost impossible to make, that any erroneous disqualification order significantly prejudiced the rights of the client." Id.[4]

We have not, however, generally allowed interlocutory discovery orders to be immediately appealable under the doctrine of present execution. See Cronin v. Strayer, 392 Mass. 525, 527 (1984). The United States Supreme Court has also not generally allowed such appeals under the collateral order doctrine. Mohawk Indus., Inc., 558 U.S. at 108, quoting Firestone Tire & Rubber Co., 449 U.S. at 377 ("we have generally denied review of pretrial discovery orders").

---

[4] The United States Supreme Court has concluded under its collateral order doctrine that an order disqualifying counsel in a civil case is not immediately appealable. Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 440 (1985). In response to the argument that a disqualification order will effectively be unreviewable on appeal from a final judgment because of the difficulty in showing that the party suffered prejudice, the Court declared that "the difficulties in proving prejudice . . . go more to the issue of the showing required to reverse a final judgment than to whether a disqualification order should be subject to immediate appeal." Id. at 438. "Absent a requirement of prejudice, the propriety of the trial court's disqualification order can be reviewed as effectively on appeal of a final judgment as on an interlocutory appeal." Id.

The trust defendants contend that the judge's partial denial of their motion for a protective order regarding their communications with Levin deprives them of their right to protect privileged attorney-client communications from disclosure to third parties, and that this right cannot be adequately vindicated on appeal after final judgment because the confidentiality of those privileged communications, once disclosed, cannot be restored. They also contend that the subject of the interlocutory appeal -- the existence of an attorney-client relationship regarding the property transaction between Levin and the trust defendants before the fire -- is collateral to the merits of the controversy, which concerns the assignment of the purchase and sale agreement to Patel.

In response, the developer plaintiffs argue that a partial denial of a motion for protective order is ultimately a discovery order, and that litigation should not generally be interrupted by allowing piecemeal appeals from such orders. They contend that the trust defendants may challenge the order on appeal after final judgment and, if the order is determined to be error, they can seek a remedy of a new trial where the attorney-client communications that were disclosed, and all information derived from those disclosures, are excluded from evidence.

The trust defendants make fair points, but the developer plaintiffs have the better argument. The trust defendants are correct that the existence of an attorney-client relationship between Levin and the trust defendants regarding the sale of the property is an issue that is collateral to any issue that will be decided at trial. They are also correct about the importance of protecting the confidentiality of privileged attorney-client communications in order to encourage "full and frank communication between attorneys and their clients." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). And we recognize that, if those communications are indeed privileged and are disclosed in discovery, a successful postjudgment appeal cannot change the fact that communications that the trust defendants intended to be confidential will have been disclosed to the developer plaintiffs.

But we agree with the developer plaintiffs that, although a successful postjudgment appeal cannot entirely eliminate the harm that arises from an order allowing third parties to learn the content of privileged communications, the trust defendants do have a viable postjudgment remedy. Unlike an order disqualifying a party's counsel, the consequences of an adverse discovery order can be ascertained, the prejudice identified, and the error remedied by barring the use of any evidence derived from the protected communications at a new trial or

other subsequent proceeding.  See Borman, 378 Mass. at 782 ("review [of order to testify at depositions] after a definitive determination of rights and liabilities would not be futile").  See also Mohawk Indus., Inc., 558 U.S. at 109 ("vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence" is adequate remedy to erroneous disclosure of privileged material).  In short, an appellate court on postjudgment appeal cannot prevent privileged communications from having been disclosed to the developer plaintiffs, but it can protect the trust defendants from the harm arising from those communications having been used against them at trial.  If the trust defendants were prejudiced at trial by the admission of evidence derived from the privileged communications revealed pursuant to the order, an appellate court may grant them a new trial, where no evidence derived from those communications will be admitted.

Notably, the trust defendants here are claiming a right of immediate appeal from a discovery order, which commonly involves claims of denial of rights or invasions of privilege.  See Borman, 378 Mass. at 784 (orders compelling witness testimony "are among the most common of everyday incidents to the process of disposing of cases, and objections on the ground of privilege . . . are frequently raised" [citation omitted]).  Discovery orders may direct a witness to testify at a deposition about

information that a witness claims would be self-incriminating, see id. at 781-782, or that a witness claims is protected by various privileges other than the attorney-client privilege, such as the spousal privilege or the psychotherapist-patient privilege.  Discovery issues regarding the scope of the attorney-client privilege -- and its application to documents sought in discovery -- may arise whenever a party produces a privilege log identifying documents that the party refuses to disclose because they purportedly contain protected attorney-client communications or attorney work product.  Whenever a judge orders disclosure in any of these discovery disputes, the aggrieved party can claim that its rights cannot be fully vindicated on appeal, because otherwise protected communications or documents will be revealed that the party was entitled to keep confidential.  But if that intrinsic harm were to suffice to make all such discovery orders appealable under the doctrine of present execution, we would be inviting "the inundation of appellate dockets with what have heretofore been regarded as nonappealable matters" (citation omitted), Cronin, 392 Mass. at 529, with the resulting delays and increased litigation costs that come with piecemeal interlocutory appeals.  Where a postjudgment appeal offers a viable, albeit imperfect, remedy, we will not grant a right to interlocutory appeal from a discovery order simply because it involves an issue of

privilege.  We thus conclude that orders requiring the disclosure of privileged material, such as the order in this case, are not categorically irremediable, and therefore are not appealable under the doctrine of present execution.[5]

We note that our analysis is consistent with that of other courts.  The Supreme Court was confronted with this same question, interpreting the Federal collateral order doctrine, in Mohawk Indus., Inc., 558 U.S. at 103.  Explaining that the Court "routinely require[s] litigants to wait until after final judgment to vindicate valuable rights, including rights central to our adversarial system," id. at 108-109, the Court noted that an erroneous privilege disclosure order is akin to other common errors that may take place throughout the life of a case.  The

---

[5] The trust defendants note that we stated in Preventive Med. Assocs., Inc. v. Commonwealth, 465 Mass. 810, 823 (2013), that the harm to a party from the disclosure of privileged attorney-client communications to an adversary "could be irreparable."  We recognized the potential for irreparable harm in that case in the context of requiring judicial supervision of the protocol used by the Commonwealth to search the electronic mail (e-mail) messages of a criminal defendant -- which were seized pursuant to a search warrant -- where the e-mail messages may contain privileged attorney-client communications, not in the context of deciding whether to allow an immediate appeal from a discovery order in a civil case under the doctrine of present execution.  See id.  We recognize here that there is intrinsic irreparable harm where a judge erroneously orders the disclosure of privileged communications, but conclude that this intrinsic harm alone does not suffice to require a right to interlocutory appeal under the doctrine of present execution where there is a viable postjudgment remedy for the use of this privileged information against the party at trial.

Court concluded that such errors may be remedied in the same way as other erroneous evidentiary rulings:  by reversing the judgment and remanding for further proceedings in which the protected material and its fruits are inadmissible in evidence. Id.  For those reasons, interlocutory appeals from attorney-client privilege disclosure orders under 28 U.S.C. § 1291 are not permitted as of right under the Federal collateral order doctrine.  Id. at 114.  Numerous State appellate courts have reached the same conclusion as a matter of State law.  See, e.g., Melia v. Hartford Fire Ins. Co., 202 Conn. 252, 258-259 (1987); Expedia, Inc. v. Columbus, 305 Ga. App. 450, 453 (2010); Abrams v. Cades, Schutte, Fleming & Wright, 88 Haw. 319, 325 (1998).

Ultimately, the doctrine of present execution represents a balancing act that weighs the harm to cost-effective litigation arising from piecemeal interlocutory appeals against the harm that a litigant may suffer from a trial court order that is irremediable on postjudgment appeal.  We conclude that the sheer volume of potential appeals that would be permitted by including privilege-related discovery orders within the doctrine of present execution, and the inevitable adverse impact on judicial efficiency, outweighs the intrinsic harm that potentially might be suffered by an aggrieved party who is denied an immediate right to appeal.

In reaching this balance, we note that denying a litigant the right to a full interlocutory appeal under the doctrine of present execution does not bar a litigant from moving or petitioning for immediate appellate review of an interlocutory order. Where a party believes that the legal questions at issue regarding a discovery order are so significant or novel that they warrant interlocutory appeal, the party may generally request the Superior Court judge to report the decision to the Appeals Court under Mass. R. Civ. P. 64. Or the party may petition a single justice of the Appeals Court under G. L. c. 231, § 118, first par., and seek redress from the single justice, as the trust defendants did here, or ask the single justice to refer the petition to a full panel of the Appeals Court. And where a party or nonparty feels so strongly about the injustice of an order compelling discovery that it is willing to suffer the sanctions that might arise from disobeying the order, the party or witness can obtain full appellate review of the order as a matter of right by refusing to comply with the order and appealing from the resulting order of dismissal or contempt. See Cronin, 392 Mass. at 528, citing Matter of Roche, 381 Mass. 624, 625 n.1 (1980).[6] We are satisfied that this

---

[6] We recognize that, as here, an attorney who denies the existence of an attorney-client relationship with the moving party regarding the subject matter of the litigation is not going to refuse to testify and risk a contempt finding. But we

collection of alternative remedies will adequately protect the rights of litigants who are egregiously harmed by interlocutory discovery orders.

2. <u>Partial denial of motion for protective order based on trust defendants' claim of attorney-client privilege</u>. Having concluded that the trust defendants are not entitled under the doctrine of present execution to appeal from the partial denial of their motion for a protective order, based on their claim that they had an attorney-client relationship with Levin regarding the sale of the property before the fire, we have two options. We can exercise our discretion under our superintendence authority to reach the merits of this appeal, where the issue "has been briefed fully by the parties . . . [and] raises a significant issue" regarding attorney-client relationships and the doctrine of privilege, "and addressing it would be in the public interest." <u>Marcus</u>, 462 Mass. at 153. Or we can dismiss the appeal, and allow the single justice of the Appeals Court to decide the G. L. c. 231, § 118, first par., petition that he stayed pending resolution of the appeal. We

decline to grant a right of interlocutory appeal to a party in a civil proceeding simply because that avenue of appeal is not available. We do not address whether a right of interlocutory appeal would be appropriate in these circumstances if the appeal concerned a privilege issue in a criminal or grand jury proceeding. Cf. <u>Matter of a R.I. Grand Jury Subpoena</u>, 414 Mass. 104, 110 (1993); <u>Matter of a Grand Jury Subpoena</u>, 411 Mass. 489, 494 (1992).

exercise the first option, and after considering the trust defendants' argument, we conclude that the motion judge's order cannot stand based on the limited findings that he made. We therefore vacate his order and remand the matter to the motion judge for further factual findings and reconsideration of the motion in light of those additional findings. We express no view as to how the motion should ultimately be decided. After the judge makes those findings and issues a new order, the aggrieved party may avail itself of the options we have identified for interlocutory appellate review -- i.e., requesting the judge to report his ruling to a panel of the Appeals Court or filing a petition under § 118, first par. -- but, for reasons we have already explained, will not be entitled to an interlocutory appeal under the doctrine of present execution.

a. Standard of review. A judge's ultimate conclusion as to whether an attorney-client relationship existed is a mixed question of law and fact, which we review de novo. See McCarthy v. Slade Assocs., Inc., 463 Mass. 181, 190 (2012), quoting Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 303 (2009) ("Mixed questions of law and fact, such as whether there has been a waiver, generally receive de novo review"); 2 P.R. Rice, Attorney-Client Privilege in the United States § 11.38, at 1253-1255 (2017) (most questions concerning issues of attorney-

client privilege involve "a mixture of law and fact"). In doing so, we accept a judge's findings of fact "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge . . . the credibility of the witnesses." Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1408 (1996).

b. Summary of the evidence and the judge's findings. It was undisputed that Levin represented the Masons, as the sellers of the property, in connection with the purchase and sale agreement, and that he was identified as their attorney of record on the agreement that was signed in September 2012. The question before the judge was whether Levin had also established an attorney-client relationship with the trust defendants, who were the buyers in this transaction. Levin testified that he had not; the trust defendants testified that he had.

Levin acknowledged that he had represented the trust defendants in a large number of matters, including real estate matters, for over twenty years, and that he did over ninety per cent of the trust defendants' legal work. He testified that, in the spring of 2012, when he learned that the trust defendants were seeking to make an offer on the property, he was representing the trust defendants in a number of other real estate transactions. In Levin's electronic mail messages with the trust defendants, he discussed the purchase and sale

agreement in conjunction with other pending matters. The trust defendants and Levin agreed that, because he was representing the Masons as the sellers, the trust defendants would identify Miriam Marcus as their attorney of record in the agreement. Levin admitted that he never communicated with Miriam Marcus, and instead communicated directly with the trust defendants because he knew that Martin always negotiated real estate transactions personally. Levin sent draft documents to the trust defendants for review, prepared a power of attorney form for Martin so that he could sign the purchase and sale agreement on behalf of the Grossman Munroe Trust, and acknowledged having "many conversations" with Martin concerning the transaction after the agreement was signed in September 2012, particularly about deadlines in the agreement and seeking an extension to perform due diligence obligations. Levin also testified that he discussed with the trust defendants their concerns about financing, construction, and permits related to the division of condominium units on the property; those issues were incorporated into a rider to the purchase and sale agreement. Levin billed the Masons and the trust defendants each one-half of his fee in connection with the purchase and sale transaction. The bill sent to the trust defendants listed the Masonic Temple transaction with other pending real estate matters on which he represented the trust defendants.

Throughout his testimony, Levin contended that he never provided particularized legal advice or assistance to the trust defendants in connection with the sale of the property, but did provide advice "affect[ing] both sides" at group meetings regarding various issues. Levin characterized his role in the matter as a simple one: the parties had discussed agreed-upon terms, and he worked to memorialize them into a working purchase and sale agreement. He made himself available to answer questions from the defendants, but he described these communications as "direction, not [advice]." Levin testified that he explicitly told the trust defendants that he would not be able to represent them in the purchase and sale transaction.

The trust defendants disputed Levin's testimony. Seymour Marcus testified that Levin had explicitly told him that Levin was going to represent both sides, and that Levin had represented opposing parties to a transaction with them before, in the context of lenders and borrowers and also buyers and sellers. Marcus stated that Levin offered particularized legal advice in meetings -- without the Masons present -- on permitting and construction issues regarding the property and on what "[his] liabilities are to the Masons." He said that Levin instructed them to list Miriam Marcus as their attorney solely as a formality.

Martin testified that he never executed a real estate transaction without representation, and virtually always used Levin to negotiate agreements and draft documents. Martin contradicted Levin's testimony that Levin merely wrote the terms that the parties had agreed upon, claiming that Levin proposed amendments to the purchase and sale agreement and made suggestions and comments throughout the negotiation process. Martin also testified that Levin never told the trust defendants that he would be unable to represent them. Rather, Martin testified, Levin made clear that he was representing both sides, and asked the trust defendants to list Miriam Marcus as their attorney only to avoid the appearance of impropriety.

At the close of the evidentiary hearing, the judge announced his findings and subsequent order. Because it was undisputed that the trust defendants approached Levin for legal advice -- and indeed received such advice -- regarding their exposure to insurer claims and other liability after the fire, the judge first found that there was an attorney-client relationship between Levin and the trust defendants after the fire. With respect to the matters involving the purchase and sale agreement before the fire, the judge found that the Masons and the trust defendants shared a common interest in the sale, transfer, and development of the property, but not a common

interest in the sense "that their interests were aligned with regard to this transaction." He noted:

> "[A] purchase and sale agreement generally is designed to protect the rights and enforce the obligations of a buyer and seller, which almost by definition are antagonistic one to the other. And in a transaction of this complexity, it seems impossible that a single attorney could represent both sides in a very complex and sophisticated real estate transaction."

The judge continued:

> "I accept the testimony as I've heard it that there was a longstanding relationship between Mr. Levin and Mr. Marcus and his various ventures that extended perhaps up to [twenty-five] years and involved countless real estate transactions . . . where Mr. Levin served essentially as in-house counsel for Mr. Marcus and his various holdings. And I acknowledge that . . . any communications [with Levin] as to all of those real estate transactions in the past would fall under the attorney-client umbrella that Mr. Levin had with Mr. Marcus and his entities. That does not mean in this particular transaction, however, that . . . Mr. Levin necessarily represented Mr. Marcus and Mr. Martin.

> "A party asserting a privilege has the burden of proving that the privilege exists. I don't find in this case that the [trust defendants have] proved to my satisfaction that Mr. Levin acted as the attorney for Mr. Marcus and Mr. Martin with regard to the negotiations leading to the signing of a [purchase and sale agreement] or with regard to negotiations leading to an extension of that [purchase and sale agreement]."

The judge thus found that there was no attorney-client relationship between the trust defendants and Levin with respect to the purchase and sale transaction before the fire.

c. Analysis. On appeal, the trust defendants do not contend that there was an express contract whereby Levin agreed to represent them with respect to the Masonic Temple purchase and sale transaction. Rather, they argue that the attorney-client relationship was implied as a matter of law by the conduct of the parties, particularly based on their reasonable belief that Levin was representing them. An attorney-client relationship may be impliedly formed "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. . . . In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it" (citation omitted). DeVaux v. American Home Assur. Co., 387 Mass. 814, 817-818 (1983).

The judge's findings raise issues both of law and of fact, none of which can be resolved without remand to the motion judge for further findings. The issue of law is that the judge, after finding that the interests of the buyer and seller in this purchase and sale transaction were "antagonistic" to each other, stated that "in a transaction of this complexity, it seems

impossible that a single attorney could represent both sides in a very complex and sophisticated real estate transaction." It is not clear from the record precisely what the judge meant by this statement, especially where the judge found that Levin represented both the trust defendants and the Masons after the fire, when their interests remained adverse.[7]

It is not ethically impossible for an attorney to represent clients with adverse interests. Under Mass. R. Prof. C. 1.7 (a), as amended, 430 Mass. 1301 (1999) -- the version of rule 1.7 in effect at the time of this transaction -- an attorney could represent clients with directly adverse interests, even in complex real estate transactions, where the attorney reasonably believed that his or her representation of each client would not adversely affect the relationship with the other client and each affected client consented after consultation.[8] But even where an attorney would have violated

_____

[7] The Masons later sued the trust defendants, and Levin testified that he only stepped aside from representing the trust defendants after that lawsuit commenced.

[8] Subsequent to the transaction at issue in this case, our rules of professional responsibility were amended. Under the current Mass. R. Prof. C. 1.7, as appearing in 471 Mass. 1335 (2015), an attorney may represent clients with directly adverse interests where the attorney reasonably believes that he or she will be able to provide competent and diligent representation to each affected client, the representation is not otherwise prohibited by law, the representation does not involve the assertion of a claim by one client against another in the same

this rule by jointly representing clients with adverse interests without consent, the attorney still would have had a separate attorney-client relationship with each client.  See RFF Family Partnership, LP v. Burns & Levinson, LLP, 465 Mass. 702, 721 (2013).  And where there is an attorney-client relationship, even one that an attorney ethically should not have entered into without consent because of a conflicting representation, the client is entitled to protect confidential communications with the attorney.  See id., quoting In re Teleglobe Communications Corp., 493 F.3d 345, 369 (3d Cir. 2007) ("even where a law firm actually violates Mass. R. Prof. C. 1.7[a] by representing two clients with adverse interests without the consent of each client, 'counsel's failure to avoid a conflict of interest should not deprive the client of the privilege'").

Where we cannot be sure what the motion judge meant by his finding that it seems "impossible" for Levin, who was already representing the Masons with respect to the sale of its property, also to represent the trust defendants with respect to that transaction, we believe it prudent to remand the matter to the judge for clarifying findings on this issue.  It is unclear what role, if any, that finding played in his ultimate

---

litigation or proceeding, and each affected client gives informed written consent.

determination that Levin did not enter into an attorney-client relationship with the trust defendants until after the fire.

We must also remand for further findings because we cannot evaluate whether the judge's findings were clearly erroneous without credibility findings regarding the conflicting testimony of Levin and the trust defendants. For example, the judge did not resolve contradictory testimony as to whether Levin explicitly told the trust defendants that he could not represent them because he was simultaneously representing the Masons, which bears on the trust defendants' claim of detrimental reliance. The judge found only that the trust defendants had failed to satisfy their burden of proving that they had an attorney-client relationship with Levin regarding the negotiation of the purchase and sale agreement and its extension, but he did not explain why.

Importantly, the judge did not address the undisputed fact that Levin billed both the Masons and the trust defendants for his legal work regarding this transaction, splitting his fee equally between them. Where, as here, an attorney bills an existing client for legal services, and where the client pays for those services, it is reasonable to infer that they had an attorney-client relationship with regard to those services. See Williams v. Ely, 423 Mass. 467, 476 (1996) ("It seems clear that [the client] would not have contributed toward payment of [the

law firm's] bills if they had received no legal advice from the firm").  An attorney's billing for legal services and a client's payment of the bill for such services may not be dispositive of the existence of an attorney-client relationship, but a finding of no attorney-client relationship with respect to legal services that were billed and paid warrants an explanation.  See Matter of Stern, 425 Mass. 708, 712-713 (1997) (trustee acted as legal advisor and attorney-client relationship was formed where, inter alia, trustee was paid fees specifically to act as attorney); Droz v. Karl, 736 F. Supp. 2d 520, 524-525 (N.D.N.Y. 2010) (while not dispositive, payment of fee to attorney is "indicator[] of an attorney-client relationship").

As to this issue, we note that an attorney-client relationship may impliedly be formed when an attorney provides "advice or assistance" (emphasis added).  DeVaux, 387 Mass. at 817-818.  Where "advice" has been defined as "[g]uidance offered," see Black's Law Dictionary 65 (10th ed. 2014), we may interpret "assistance" here to mean "services rendered."  See 1 P.R. Rice, Attorney-Client Privilege in the United States, supra at § 7.10, at 1273-1277 ("Legal assistance requires the involvement of the judgment of a lawyer in his capacity as a lawyer," and it "requires an attorney to render the type of services that his education and certification to practice qualify him to render for compensation" [quotation omitted]);

Sheinkopf v. Stone, 927 F.2d 1259, 1266 (1st Cir. 1991) (describing attorney's obtaining of party's check and having that party sign various documents as "assistance . . . rendered," and distinguishing "legal advice" from actual, concrete transactions). The question whether Levin provided "assistance" to the trust defendants that created an attorney-client relationship is related to, but distinct from, the question whether he provided them with legal "advice." The motion judge may wish to consider this issue on remand.

Conclusion. The order of the Superior Court judge partially denying the trust defendants' motion for a protective order is vacated, and the matter is remanded for further findings consistent with this opinion and for reconsideration of the motion in light of those findings.

So ordered.